CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
AUG 21 2006
JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ROY M. TERRY, JR., RECEIVER, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> MODERN INVESTMENT COMPANY LIMITED, *et al.*, <br><br> *Defendants.* | CIVIL ACTION NO. 3:04-CV-00085 <br><br><br> MEMORANDUM OPINION <br><br><br> JUDGE NORMAN K. MOON |

This matter is before the Court on the Receiver's motion for partial summary judgment on choice of law, filed January 13, 2006. The motion, and supplements thereto, raise the issue of which jurisdiction's law of fraudulent conveyances apply under Virginia choice of law principles when a conveyance challenged as fraudulent involves multiple banks and possible participants, and wire transfers crossing international and domestic borders.

**I. Standard of Review**

A party is entitled to summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Affidavits support or opposing a summary judgment motion "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

1

In addition to the particular forms of evidence listed in Rule 56(c), the Court may consider any material that would be admissible at trial. *See, e.g., Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993); *Aguilera v. Cook County Police & Corr. Merit Bd.*, 760 F.2d 844, 849 (7th Cir.), *cert. denied* 474 U.S. 907 (1985). Evidence which would be inadmissible at trial may not be considered on a motion for summary judgment. *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251-52 (4th Cir. 1991). Generally, documents submitted in support of a summary judgment motion must be authenticated by and attached to an affidavit that meets the requirements of R. 56(e). Fed. R. Civ. P. 56(e). Unsworn, unauthenticated documents are properly disregarded. *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993). However, unauthenticated documents may be considered by the court if not challenged. *See H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454 (2d Cir. 1991); *U.S. v. "Monkey,"* 725 F.2d 1007, 1011 n. 4 (5th Cir. 1984); 10A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. §2722 n. 43 (3d ed. 1997 & Supp.).

In considering a motion for summary judgment, a court "is required to view the facts and draw reasonable inferences in a light most favorable to the non-moving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citations omitted).

## II. Background

This matter arises in connection with a civil action brought by the Securities and Exchange Commission ("SEC") to recover funds illegally disbursed by Terry L. Dowdell ("Dowdell") while operating a Ponzi scheme in violation of Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a) and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. *Securities and Exchange Commission v. Terry L. Dowdell*, Case No. 3:01CV00116 (W.D.

2

Va. filed Nov. 19, 2001). From approximately April 1998 through the Spring of 2002, Dowdell raised more than $70 million through the sale of fictitious securities to would-be investors in a fraudulent trading program (the "Vavasseur Program") purportedly operated by the Bahamas-based Vavasseur Corporation ("Vavasseur"). None of these funds were ever used for any trading program; rather, Dowdell, through Vavasseur, paid old investors with funds obtained from new investors. To facilitate recovery of investor losses, this Court appointed Roy M. Terry, Jr. and the law firm of DurretteBradshaw PLC as Receiver for Dowdell and his various business entities.[1]

The Receiver filed this action against Kevin O'Keefe ("O'Keefe"), Karen O'Keefe, and Collin O'Keefe[2] (collectively, the "O'Keefes") and Modern Investment Company, Ltd., ("Modern Investment") (collectively, the "Defendants") on October 27, 2004, seeking to recover funds in excess of $1.3 million dollars that the Receiver alleges were fraudulently transferred from Vavasseur to the Defendants. The Receiver brought this partial summary judgment motion to settle the issue of which jurisdiction's law of fraudulent conveyances applies to the wire transfers the Receiver seeks to avoid.

### III. Undisputed Facts

*a. Vavasseur Wire Transfers to Defendants Through February 2001*

---

[1] For additional information on Dowdell's fraudulent scheme and the appointment of the Receiver, *see Consent & Stipulation*, Case No. 3:01CV00116, docket no. 218 (June 4, 2002); *Order Granting Jt. Mot. for Appoint. of Receiver*, Case No. 3:01CV00116, docket no. 243 (July 12, 2002); *Terry v. June*, 420 F. Supp. 2d 493 (W.D. Va. 2006).

[2] Collin O'Keefe is the son of Karen and Kevin O'Keefe, and was six years old at the time of the deposition of Karen and Kevin O'Keefe. *Depo. of Kevin & Karen O'Keefe* at 48 (Oct. 28, 2005). Kevin O'Keefe named Collin and Karen O'Keefe as beneficiaries of Modern Investment. *Id.* at 48-49.

O'Keefe first learned about an investment opportunity with Dowdell through a business associate, Robert June, Jr. ("June"), who introduced him to Dowdell. *Depo. of Kevin & Karen O'Keefe* at 10-11 (Oct. 28, 2005) (hereafter "Depo"). Dowdell and June advised O'Keefe that he would need to set up an offshore company and bank account in order to participate, and either Dowdell or June recommended that he contact Lennox Paton, a Bahamas-based law firm, to carry out these steps. *Id.* at 24-26.

Lennox Paton had a preexisting relationship with Dowdell, having assisted him in the purchase and corporate maintenance of Vavasseur, and in the preparation of the standard investment contract used by and between Vavasseur and the Vavasseur investors. *Consent & Stipulation*, Case No. 3:01CV00116, docket no. 218 ¶ 18 (June 4, 2002).[3]

O'Keefe traveled to the Bahamas and met with June in early 2000. *Depo.* at 34. On that trip, and with the assistance of Lennox Paton, O'Keefe caused Modern Investment to be incorporated under Bahamian law, and very soon thereafter also caused an account to be opened at a Bahamas-based bank called HandelsFinanz. *Depo.* at 24-26, 115. On May 15, 2000, O'Keefe invested an initial $500,000 "into an investment vehicle directed by an advisor at Lennox Paton." *Amended Answer* at ¶ 18; *see Depo.* at 22.

From approximately September 2000 through February 2001, the HandelsFinanz account ostensibly received Vavasseur "profit" distributions from Dowdell's AmSouth bank account in Florida, which were repatriated via wire transfer to Kevin O'Keefe's Comerica bank account in Michigan. *Pl. List of Proposed Ex.*, docket no. 35 at Tabs 1, 35-46 (Oct. 17, 2005) (hereafter

---

[3] The Court is entitled to judicially notice facts concerning Dowdell's operation of a Ponzi scheme established in the record of the SEC enforcement case. *Order Granting Joint Motion for Permanent Injunction*, 3:01CV00116, docket no. 219 (June 4, 2002) (incorporating by reference the June 4, 2002 Consent & Stipulation).

4

"Prop. Ex.").

The O'Keefes assume that Modern Investment was the account holder of the HandelsFinanz account, but are not certain. *Depo.* at 79-80. Lennox Paton was the registered agent of Modern Investment in the Bahamas and apparently had signature authority over the account: O'Keefe believes that Sean Nottage, an employee of Lennox Paton, would authorize wire transfers from the HandelsFinanz account to his Michigan account. *Id.* at 75, 77-78. O'Keefe assumes, but does not remember, whether he had signature authority too. *Id.* at 79. Neither Kevin nor Karen O'Keefe have any recollection of ever receiving a bank statement from HandelsFinanz. *Id.* at 26-27. They were also unclear as to how Kevin O'Keefe would communicate a request to Lennox Paton that money be wired from the HandelsFinanz account to his Michigan account. *Id.* at 77-79. Karen O'Keefe recalled that the account was a formal requirement "that Modern Investment needed to have." *Id.* at 28.

Prior to the O'Keefes' deposition, the Receiver had requested production of "all documents relating to Handelsfinanze" from January 1, 1998 onward pursuant to Rule 34. *Motion to Compel*, docket no. 42 Exh. A (Feb. 16, 2006) ("Motion to Compel"). The O'Keefes purported at their October 28, 2005 deposition to be able to obtain records pertaining to the HandelsFinanz account. *Depo.* at 74. Having received no such records, the Receiver sent a letter to their attorney dated December 20, 2005, requesting "bank records showing how much money was put into the Handelsfinanz account." *Motion to Compel* Exh. C. In response to the Receiver's subsequent motion to compel, the O'Keefes' attorney sent a letter dated February 24, 2006, noting that Kevin O'Keefe would "agree to sign a release so you can access his

5

Handelfinanz account."[4] *D. Supp. Amend*, docket no. 51 Exh. A (June 30, 2006).[5]

### b. Vavasseur Transfers to Defendants from February 2002 through April 2002

From late February 2001 through December 2001, the Defendants did not have an off-shore bank account. Vavasseur profit distributions were reinvested, increasing their capital investment in Dowdell's program. *Prop. Ex.* at Tab 1; *Depo.* at 63-64, 136-37.

On January 11, 2002, Modern Investment was reincorporated in the Commonwealth of Dominica, and on January 24, 2002, Kevin O'Keefe opened an account in its name at a Dominican bank, Overseas Development Bank and Trust ("ODBT").[6] *Prop. Ex.* at Tabs 60-61; *Depo.* at 135. Although Kevin O'Keefe apparently had power of attorney over Modern Investment's account at ODBT, neither he nor his wife recall ever receiving bank statements from ODBT, and he had trouble making a withdrawal from the ODBT account. *Depo.* at 52-53, 131, 142-44.

From February 2002 through April 2002, Vavasseur account records ostensibly show that Modern Investment's ODBT account received wire transfers totaling at least $1,474,107.17 in

---

[4] To be considered as evidence under Rule 56(e), "a letter 'must be attached to an affidavit and authenticated by its author in the affidavit or a deposition.'" *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) (quoting 10A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. §2722 at 58-60 (1983 & 1993 Supp.)). The February 24, 2006 letter was not attached to an affidavit and authenticated, but the Court may consider it because the Receiver did not object to its authenticity.

[5] The Receiver represents that the issuance of a Letter of Request to obtain these records would be futile, because HandelsFinanz never registered as an entity doing business in the Bahamas as required by law and the Bahamian authorities have represented that they do not know how to serve HandelsFinanz. *Rec. Supp. Memo.*, docket no. 46 at 4 n.2 (March 31, 2006); *Rec. Resp.*, docket no. 52 Exhs. A, B (July 14, 2006).

[6] At some point, ODBT changed its name to Investor's Bank & Trust ("IBT"), *see Rec. Supp. Amend*, docket no. 50 Exh. 2 (June 16, 2006). The Court will refer to the bank as ODBT for sake of simplicity.

Vavasseur "profit" distributions, which transfers were then repatriated to the O'Keefe's Comerica account in Michigan. *Prop. Exh.* at Tab 1. However, O'Keefe's Comerica account records reveal that wire transfers totaling $1,469,077.24[7] originated not from Modern Investment's ODBT account, but rather from accounts at Banco Platini in Panama, Fortis Banque in Belgium, and the Bank of Ireland. *Rec. Supp. Amend.*, docket no. 50, Exhs. 19-25 (June 16, 2006) (hereafter "Rec. Supp. Amend.").[8] Dowdell has stipulated that Vavasseur held investor funds in accounts at these same three banks, and specifically that Vavasseur held an account in the name of "I.Z Holding Co." at the Bank of Ireland. *Consent & Stipulation*, Case No. 3:01CV00116, docket no. 218 ¶ 38 (June 4, 2002); *Affid. of Terry Dowdell dated October 29, 2002*, Case No. 3:01CV00116, docket no. 363 ¶ 25 (Jan. 28, 2003). "I.Z. Holding Company Limited" is identified as the Originator of a $100,000.00 wire transfer received in O'Keefe's Comerica account on April 15, 2002, and of another $200,000.00 transfer received on April 25, 2002. *Rec. Supp. Amend.*, Exhs. 23, 25.

Dowdell testified in the SEC civil case about a document showing deposits and

---

[7] This sum is net of some wire transfer fees, but may not reflect deductions for some additional fees. *See* Exhs. 23-25.

[8] The Originators of the wire transfers are identified as "First Global Foundation" (2 wires totaling $41,745.15 received on February 15, 2002) (Banco Platina) (Exh. 19); "Investors Bank Trust Lim Kennedy Avenue 42525 Roseau" (1 wire of $82,843.00 received on March 28, 2002) (Fortis Banque) (Exh. 21); "Fitzgerald and Associates Clients" (1 wire of $1,000,000.00 received on March 28, 2002) (Bank of Ireland) (Exh. 22); "I.Z. Holding Company Limited" (1 wire of $100,000.00 received on April 15, 2002) (Bank of Ireland) (Exh. 23); "First Global Foundation" (1 wire of $44,499.09 received on April 15, 2002) (Banco Platina) (Exh. 24); "I.Z. Holding Company Limited" (1 wire of $200,000.00 received on April 25, 2002) (Bank of Ireland) (Exh. 25).

Although these records are hearsay, they may be considered by the Court under the business records exception to Fed. R. Evid. 802. And though they have not been authenticated, the Court may consider them because Defendants have not objected to their authenticity.

7

withdrawals made between January 1, 2002, and April 15, 2002, from an account Vavasseur held at ODBT. *Rec. Supp. Amend.*, Exhs. 17-18. The document purported to show a payment from Vavasseur to Modern Investment of $1 million, but had a notation, "see BOI." *Id.*, Exh 17. Dowdell explained that BOI stands for "Bank of Ireland."[9] *Id.*, Exh 18.

ODBT was at least partly controlled and managed by Vavasseur agents.[10] In March 2001, Dowdell represented to the SEC through his attorneys that he had terminated his relationship with Vavasseur and that Vavasseur had ceased doing business in the United States, when, in fact, he continued to exert full operational control through Spring 2002. *Consent & Stipulation*, Case No. 3:01CV00116, docket no. 218 ¶¶ 21, 25 (June 4, 2002). Shortly after making these representations, Dowdell transferred title ownership in Vavasseur to a foreign corporation owned by Ian Collins ("Collins"), but then employed the services of Shinder Gangar ("Gangar"), Alan White ("White"), and Collins to continue operating Vavasseur. *Id.* at ¶¶ 22, 26.

Gangar, White, and Malcolm West ("West"), who owned a majority interest in ODBT, met with Christopher Stone ("Stone") in August 2000, and reached an agreement that Stone

---

[9] The Receiver submitted additional documentation explaining this notation, but the Court may not consider it as evidence because it is an email containing hearsay that would not be admissible at trial. *Id.*, Exh. 17 at 1872-73.

[10] The Receiver represents that the two best sources of evidence regarding the governance of ODBT, and Vavasseur's involvement in it, are beyond his reach. ODBT became insolvent by August 2002, and the winding up of its affairs was entrusted to a Canadian receiver who refuses to share account information with the Receiver. *Rec. Supp. Amend.*, at 2-4, Exhs. 1-2. Also, Vavasseur agents involved in ODBT's operations have been charged in connection with their involvement in the Vavasseur fraud and have invoked their right under British law not to incriminate themselves. *Id.* at 3-4. British authorities refuse to release documentary evidence seized in connection with the investigation. *Id.* at 4.

Thus, the discussion that follows is pieced together from evidence submitted in the involuntary bankruptcy proceedings of these Vavasseur agents. *Id.* at 4.

8

would undertake a consultancy at ODBT to examine its books and performance.[11] *Rec. Supp. Amend.*, Exh. 4 at 205-07 (*Leicestershire Constabulary Witness Statement of Christopher Stone*) ("Stone Witness Statement").[12] At an earlier meeting, Gangar had informed Stone that he wished to "become involved with an offshore Bank in the Caribbean either by outright purchase of the shares or to obtain a controlling interest." *Id.* at 205. Stone was apparently charged with evaluating ODBT's potential as a takeover target, and Dobb White & Co. ("DWC") is the entity through which Gangar and White sought to acquire ODBT. *Id.* at 206.

A long time associate of Gangar, David Taylor ("Taylor"), expressed a desire to work in Dominica and was installed as the new General Manager of ODBT in May 2001. *Id.* at 208. Taylor was a director of Vavasseur Corporation. *Rec. Supp. Amend.*, Exh. 11, (*Statement of Roger Walter Francis Taylor*). He reported the treasury position of ODBT to DWC on a daily basis. *Stone Witness Statement* at 208. According to Stone, Taylor "was always the linkman

---

[11] Stone is an Associate of the Chartered Institute of Bankers. *Rec. Supp. Amend.*, Exh. 4 at 213.

[12] Rule 56(e) requires that any affidavit submitted in support of summary judgment state facts based on personal knowledge and that would be admissible in evidence, and affirmatively show that the affiant would be competent to testify to the matters stated.
 The Court does not consider as evidence Stone's email narrative to the Receiver, "A Banker's Tale," because Defendants have properly objected to it as unsworn hearsay.
 However, the Court will consider Stone's sworn written statement made under penalty of perjury to the Constabulary of Leicestershire incorporating by reference a typed statement, each page of which was signed by Mr. Stone. To the extent this sworn statement fails to comply with the requirements of Rule 56(e), Defendants have waived any objection by not moving to strike it. "An affidavit that does not measure up to the standards of Rule 56(e) is subject to a motion to strike; and formal defects are waived in the absence of a motion or other objection." *Noblett v. General Elec. Credit Corp.*, 400 F.2d 442, 445 (10th Cir.), *cert. denied* 393 U.S. 935, 89 S.Ct. 295 L.Ed. 2d 271 (1968); *see also Perez v. Volvo Car Corp.*, 247 F.3d 303, 314 (1st Cir. 2001); *Klingman v. Nat'l Indem. Co.*, 317 F.2d 850, 854 (7th Cir. 1963); *Auto Drive-Away Co. of Hialeah, Inc. v. Interstate Commerce Comm'n*, 360 F.2d 446, 448-49 (5th Cir. 1966).

9

between DWC and the bank but by the time [in June 2002] we were operating with Banamex [a correspondent bank in Mexico City] he was not able to process payments or have operational control without referral to me." *Id.* at 210.

In his sworn statement, Stone explained that in the relevant time period—February 2002 through April 2002—ODBT had trouble maintaining correspondent relationships with other banks, and a Gangar associate took charge of setting up new banking relationships:

> [B]y late January [2002] we [ODBT] were given notice by our only correspondent bank, National Commercial Bank of St. Kitts and Nevis that they wished to close our account by 28th February 2002. This was a major blow, as our means of transmitting and receiving money would have been cut off. Without my knowledge Gary McDuff a known friend of [Gangar] and an introducer of CD business to the bank opened a correspondent bank account in KCB Belgium and later at Fortis Bank Antwerp . . . .
> The Fortis account kicked into life in March 2002 by large deposits to recognised accounts controlled by [Taylor] and others who were well known to the bank . . . . By the 8th April Fortis had frozen this account on instructions from the Belgium Money Laundering unit . . . .
>
> Without Banco Platini in Panama our operations would have seized up and although we had to proceed through Gary McDuff as an intermediary the operation proved successful until June 2002 when we were able to use our new correspondents . . . .

*Id.* at 209-10.[13]

### IV. Discussion

On February 27, 2006, this Court entered an Order and Memorandum in a related matter, *Terry v. June*,[14] holding *inter alia* that (1) Virginia's choice of law rules apply to the Receiver's fraudulent conveyance claims; (2) a fraudulent conveyance claim is most properly characterized

---

[13] The Court declines to consider as evidence the April 13, 2001 email from VavasseurNassau@aol.com to VavasseurNassau@aol.com stating that Vavasseur Corp.'s new address is P.O. Box 525, 42 Kennedy Ave., Roseau, Dominica, attached as Exh. A to the Receiver's August 3, 2006 surrebuttal. Although the implications of Vavasseur having the same physical address as ODBT are indeed interesting, the entire text of the email is hearsay, its author and provenance are unclear, and the Defendants have had insufficient opportunity to object to it.

[14] 420 F. Supp. 2d 493 (W.D. Va. 2006).

10

Case 3:04-cv-00085-NKM-BWC   Document 55   Filed 08/21/06   Page 10 of 18   Pageid#: 564

as sounding in tort for choice of law purposes, and therefore the law of the "place of the wrong"—where the last event necessary to complete the fraudulent conveyance occurs—governs; (3) the last event necessary is the place where the transfer is completed; and (4) under the Virginia law of funds transfers, a transfer made by wire is deemed completed in the jurisdiction where the receiving bank is located. "A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order." Va. Code Ann. § 8.4A-104(a); *see June*, 420 F. Supp. 2d at 504.

The Receiver's position is that none of the transfers from Vavasseur to the Defendants were actually "completed" for choice of law purposes until they reached John O'Keefe's Comerica bank account in Michigan, and, thus, Michigan's Uniform Fraudulent Transfer Act ("UFTA") applies. In support of its position, the Receiver cites evidence that (i) Vavasseur agents effectively controlled Modern Investment's account at HandelsFinanz, and thus were the true beneficiaries of transfers to this account between September 2000 and February 2001; (ii) most of the February 2002–April 2002 Vavasseur "profit" distributions appear to have been wired directly to O'Keefe's Comerica account from Vavasseur-controlled accounts, bypassing Modern Investment's account at ODBT altogether; and (iii) ODBT's management had been hijacked during this period by Vavasseur agents who managed client accounts to serve Vavasseur's interests, and thus Modern Investment did not effectively control its ODBT account and could not have been the beneficiary of any wire transfer sent by Vavasseur.

Defendants argue that a genuine dispute of fact exists as to whether Modern Investment exercised exclusive dominion and control over its HandelsFinanz and ODBT bank accounts, and therefore summary judgment on choice of law is inappropriate.

11

### a. HandelsFinanz

On June 2, 2006, the Court ruled that the Receiver had made a *prima facie* showing that the Defendants did not exercise exclusive dominion and control over the HandelsFinanz account and that control in fact was exercised by an agent of Vavasseur, Lennox Paton. In light of Defendants' discovery failures, the Court further ruled that the burden would shift to them to prove otherwise. *Op. & Order*, docket no. 49 at 5-6 (June 2, 2006). Specifically, Defendants were ordered to produce rebuttal evidence showing that wire transfers to Modern Investment's account were beyond the dominion and control of Vavasseur, else the Court would enter judgment that Vavasseur profit distributions made by wire transfer in 2000 and through February 2001 were not completed until they reached Kevin O'Keefe's Comerica account.

Defendants have offered no satisfactory rebuttal evidence. The letter dated June 27, 2006, purporting to be from "Vc elle E. Nevil z Clarke" of Lennox Paton cannot be considered by the Court as evidence because it is unsworn, unauthenticated hearsay to which the Receiver has objected. *D. Supp. Memo.*, docket no. 51 Exh. C (June 30, 2006); *Rec. Resp.*, docket no. 52 at 6 (July 14, 2006).

Defendants also argue that the Court erred in finding the Receiver's circumstantial evidence of Vavasseur domination sufficient to shift the burden of proof to them on summary judgment.

Although the Receiver's evidence may be circumstantial, it does show that (i) Modern Investment and its account at HandelsFinanz were established at the advice of June and Dowdell, solely for the purpose of serving as vehicles for the O'Keefes' participation in the Vavasseur Program; (ii) O'Keefe transferred $500,000 as an initial investment in the Program "into an

12

investment vehicle directed by an advisor at Lennox Paton"; (iii) Lennox Paton had a preexisting relationship with Dowdell and had a hand in Vavasseur's creation and its activities; and (iv) to repatriate funds to his Michigan account, O'Keefe apparently had to contact an agent of Lennox Paton to issue the payment order.

The deposition evidence, which speaks for itself and cannot reasonably be construed in a light more favorable to Defendants, shows that O'Keefe assumed but was not sure whether he had signature authority over the HandelsFinanz account or whether Modern Investment was the account holder. Defendants failed to respond to discovery requests for documents relating to HandelsFinanz that could have clarified who exercised dominion and control over the account. In light of these circumstances, it was an appropriate sanction to shift the burden to Defendants, the sole parties who had authority to obtain HandelsFinanz records, to prove that Vavasseur's alleged transfers to Modern Investment's HandelsFinanz account in fact occurred and were "completed" within the meaning of the Virginia law of funds transfers.[15]

---

[15] Defendants dispute that they did not fulfill discovery obligations. While the Court of course agrees that memories fade, it disagrees that their discovery obligations were discharged by offering to execute a release so the Receiver could access the HandelsFinanz account. Rule 34(a) of the Federal Rules of Civil Procedure provides in relevant part:

> Any party may serve on any other party a request (1) to produce and permit the party making the request . . . to inspect and copy, any designated documents . . . which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served.

"Control" is defined as the legal right to obtain the document on demand. *Gerling Intern. Ins. Co. v. Comm'r of Internal Revenue*, 839 F.2d 131, 140 (3d Cir. 1988) (citing 8 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. §2210 (2d ed.)); *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984) ("[C]ontrol is the test with regard to the production of documents [and] is defined not only as possession, but as the legal right to obtain the documents on demand."); *Poole ex rel. Elliott v. Textron, Inc.*, 192 F. R. D. 494, 501 (D. Md. 2000) (same). Defendants have not shown that they made any attempt to obtain documents related to the HandelsFinanz account, or even intimated that these documents are beyond their control. Because the Receiver

O'Keefe's testimony that he caused transfers from Modern Investment's HandelsFinanz account to his Comerica account by requesting them from Sean Nottage at Lennox Paton does not dispose of the control issue. If Lennox Paton was the account holder, or even if it was just a co-signatory, but its agents ultimately answered to Vavasseur and not to O'Keefe, then Defendants could not reasonably be deemed "beneficiaries" of Vavasseur wire transfers to the HandelsFinanz account. *See* Va. Code § 8.4A-103(a)(2) ("'Beneficiary' means the person to be paid by the beneficiary's bank."). This is so even if Lennox Paton complied with O'Keefe's requests for transfers to his Michigan account, as it was in Vavasseur's interest to keep early and/or favored investors in the Ponzi scheme satisfied and unaware of its dominion over their investment accounts.

It is the judgment of the Court that Vavasseur profit distributions made by wire transfer to Defendants between September 2000 and February 2001 were not complete until they reached Kevin O'Keefe's Comerica account in Michigan. Under Virginia choice of law principles, the place of wrong was Michigan, and Michigan's UFTA applies to these transactions.

### b. ODBT

The next question is whether any material issue of disputed fact exists as to where Vavasseur transfers to Defendants were "completed" in the February through April 2002 period.

Statements of O'Keefe's Comerica bank account during this period list wire transfers from the following "Originator's banks": Banco Platini in Panama, Fortis Banque in Belgium, and the Bank of Ireland.

"Originator's bank" is a defined term within the law of funds transfers. A "Funds

---

should not and does not bear Defendants' discovery burden, the decision to shift the burden of proof to Defendants was warranted.

14

transfer" is a "series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order" and the term "includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order." Mich. Comp. Laws § 440.4604(a) (2003). An "intermediary bank" is "a receiving bank other than the originator's bank or the beneficiary's bank." *Id.* at § 440.4604(b). An "originator" is the sender of the first payment order in a funds transfer. *Id.* at § 440.4604(c). The "originator's bank" is "the receiving bank to which the payment order of the originator is issued if the originator is not a bank." *Id.* at § 440.4604(d).

The Uniform Commercial Code comments to these definitions make clear that even when the originator's bank receives a payment order that it cannot execute without relying on a "correspondent" bank to serve as an intermediary—because it lacks a direct relationship with the beneficiary's bank—it and the originator are still identified as the "originator's bank" and the "originator" of the transfer, respectively. *See* Mich. Comp. Laws Ann. § 440.4604 (2003), U.C.C. cmt 1.

Thus, because none of the originators identified in O'Keefe's bank records is Modern Investment, a strong inference can be drawn that the 2002 Vavasseur distributions were either (i) wired directly from a Vavasseur account to O'Keefe's Comerica account, never passing through Modern Investment's ODBT account, or (ii) wired to the ODBT account, but subsequently sent to accounts at other banks identified in the Comerica records as "Originator's banks." If (i) is the case, and no Vavasseur funds actually passed through Modern Investment's ODBT account (despite Vavasseur bookkeeping entries to the contrary), then Virginia choice of law principles clearly require application of Michigan law.

15

Assuming that (ii) is the case, Defendants make much of the possibility that ODBT "held accounts at other banks, like Fortis Bank in Belgium, to make payments to its depositors," or that it used correspondent banks to carry out funds transfers to the Comerica account. *D. Supp. Amend.*, docket no. 53 at 4-5, 8 (July 21, 2006). The latter explanation is inconsistent with the terminology of the Uniform Commercial Code, as adopted in Michigan (and elsewhere) and detailed above. The bank receiving a payment order is referred to as the "originator's bank" even if it must rely on correspondent banks—referred to as intermediary banks—to carry out funds transfers. Further, ODBT would have been identified in the Comerica statements as the originator if it ordered funds transfers from its own accounts at other banks; however, it was so identified only once. *See supra* fn. 8 (Exh. 21) ("Originator: . . . Investors Bank Trust Lim Kennedy Avenue 42525 Roseau" . . . Originator's Bank: . . . Fortis Banque" ).[16] As for the other transfers, an originator of two transfers totaling $300,000, "I.Z. Holdings," was admitted by Dowdell to be the name of a Vavasseur account at the Bank of Ireland, and the other originators are mystery entities that held accounts at banks where Vavasseur was also an account holder.

The bank records showing transfers originated by I.Z. Holdings are direct evidence that funds purportedly transferred from Modern Investment's ODBT account were actually sent to O'Keefe from a Vavasseur account; they support the Receiver's theory that Vavasseur's agent DWC paid investors "what it wanted, when it wanted, from any bank account it had access to, without regard to the niceties of client account balances or the like." *R. Surrebuttal*, docket no. 54 at 3 (Aug. 3, 2006). Further, when coupled with Dowdell's sworn statements and O'Keefe's Comerica statement, the "BOI" notation next to the record of a $1 million transfer to Modern

---

[16] Roseau is the capital of Dominica, and as noted *supra* at fn.6, ODBT changed its name to Investor's Bank & Trust.

16

Case 3:04-cv-00085-NKM-BWC Document 55 Filed 08/21/06 Page 16 of 18 Pageid#: 570

Investment from Vavasseur's ODBT account on March 23, 2002, also lends support to this theory. Dowdell testified that BOI signifies "Bank of Ireland," and stipulated that Vavasseur held investor money in various accounts there (only some of which went by "I.Z. Holdings"). The Vavasseur accounting entry matches up with O'Keefe's receipt of the $1,000,000 (less a $10 wire fee) on March 28, 2002, allowing for a few extra days as the funds transfer passed through at least one intermediary bank. *See Rec. Supp. Amend.*, Exh. 22. Added to O'Keefe's testimony about his trouble making a withdrawal from Modern Investment's ODBT account, the only reasonable inference is that payment orders initiated by O'Keefe were not paid out of any account that he controlled, but at the discretion of Vavasseur agents out of Vavasseur or client accounts where funds happened to be available.

This conclusion is bolstered by the contents of Chris Stone's affidavit. Viewing Stone's statements in the light most favorable to Defendants, but also with the light of reason, it is entirely possible that Stone was "in control and ensured that accounts were opened properly" in the months after Taylor was installed by Gangar and White and began reporting ODBT's treasury position to DWC on a daily basis. *Rec. Supp. Amend.*, Exh. 4 at 207. However, Stone also clearly states that during the period in which ODBT was suffering a correspondent banking crisis, which included February 2002 through April 2002, he was not in control and ODBT's existence and operations depended on Gangar cronies:

> [B]y late January [2002] we [ODBT] were given notice by our only correspondent bank, National Commercial Bank of St. Kitts and Nevis that they wished to close our account by 28th February 2002 . . . . ***Without my knowledge*** Gary McDuff a known friend of [Gangar] and an introducer of CD business to the bank opened a correspondent bank account in KCB Belgium and later at Fortis Bank Antwerp . . . . The Fortis account kicked into life in March 2002 by large deposits to recognised accounts ***controlled by*** [Taylor] and others who were well known to the bank . . . . By the 8th April Fortis had frozen this account on instructions from the Belgium Money Laundering unit . . . .

17

Without Banco Platini in Panama our operations would have seized up and although *we had to proceed through Gary McDuff* as an intermediary the operation proved successful until June 2002 . . . .

*Id.* at 209-10 (emphasis added).

Although the Receiver's evidence is circumstantial, it collectively and undeniably points to one conclusion, which is not genuinely disputed by Defendants' evidence: Vavasseur, not Defendants, exercised control over any funds actually held in Modern Investment's ODBT account. Only when a Vavasseur profit distribution was finally wired to O'Keefe's Comerica account—at a bank that held his funds in presumed compliance with the duties owed to account holders—was it "completed by acceptance by the beneficiary's bank . . . for the benefit of the beneficiary." Va. Code Ann. § 8.4A-104(a) (emphasis added). Therefore, with respect to the 2002 Vavasseur transfers, Michigan again is the place of the wrong.

## V. Conclusion

Neither the September 2000 through February 2001, nor the February 2002 through April 2002, wire transfers of Vavasseur profit distributions were "completed" until they reached Kevin O'Keefe's Michigan bank account. Virginia choice of law principles therefore require application of the Michigan Uniform Fraudulent Transfer Act to the Receiver's fraudulent conveyance claim.

An appropriate order shall issue.

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion to all counsel of record.

ENTERED: *[signature]*
U.S. District Judge

*August 21, 2006*

18